# RECORD NO. 13-2468

## IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

V. CASSEL ADAMSON, III,

*Plaintiff - Appellant,*

v.

COLUMBIA GAS TRANSMISSION, LLC,

*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, AT RICHMOND

**OPENING BRIEF OF APPELLANT**

S. Sadiq Gill
Brittany J. Berlauk
John B. Warden, IV
DURRETTECRUMP PLC
Bank of America Center
1111 East Main Street, 16th Fl.
Richmond, Virginia 23219
(804) 775-6900
egill@durrettecrump.com
bberlauk@durrettecrump.com
bwarden@durrettecrump.com

*Attorney for Appellant*
*V. Cassel Adamson, III*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                              YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     YES    NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____

Counsel for: _____

# CERTIFICATE OF SERVICE

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

| _____ | _____ |
|---|---|
| (signature) | (date) |

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE.................................................................2

STATEMENT OF THE FACTS ..............................................................3

SUMMARY OF ARGUMENT ...............................................................9

STANDARD OF REVIEW ...................................................................11

ARGUMENT ........................................................................................11

    A.    The district court did not give proper weight to the Virginia circuit court decision that construed the same Easement ...................11

        1.    Virginia law is controlling........................................12

        2.    Because there is no Virginia Supreme Court decision on point, the district court should have given weight to the *Pounders* decision....................................................13

    B.    The district court erred by granting summary judgment for Columbia because there were disputes of certain material facts .........18

        1.    There was a dispute as to the width which Columbia purportedly needed ..................................................18

            a.    Columbia's claimed need lacks foundation......................19

            b.    Columbia's evidence of need is contrary to its undisputed actions for decades .........................................20

            c.    Columbia's evidence of need is internally inconsistent and clearly pretextual.......................................................23

i

2.     There was a dispute as to the historic width of the clearing.....24

3.     It was improper to decide the factual question at the summary judgment stage .........................................................26

C.     The district court's construction of the ROW Agreement does not comport with Virginia law and renders it void ....................................26

1.      Virginia law requires property rights to be sufficiently certain such that they provide notice ........................................27

a.     The legal framework under Virginia law .......................28

i.     If the language of a grant is not ambiguous or uncertain, the grantee gets what the language conveys (i.e., what is reasonably sufficient to accomplish the expressed object).......................28

ii.     If the language of a grant is ambiguous or uncertain, the intent of the original parties governs ............................................................30

b.     The ROW Agreement is uncertain and ambiguous in terms of its dimension, bit is clear on other subjects......31

2.     The district court improperly relied upon *Anderson v. Delore*.......................................................................................32

3.     The district court's construction of the ROW Agreement and its application of the law create impermissibly uncertain rights.......................................................................35

4.     The district court's construction of the ROW Agreement violates the rule against perpetuities .........................................36

5.     The only way to render the ROW Agreement valid is to limit the Easement to the width that was originally taken........40

a.     Competent evidence supports that the original taking was approximately forty feet wide ...................................42

b.  The  district  court  impermissibly  attributed significance to sixty foot plat notations..........................44

CONCLUSION .......................................................................................48

REQUEST FOR ORAL ARGUMENT ..................................................49

CERTIFICATE OF COMPLIANCE.....................................................50

CERTIFICATE OF SERVICE ..............................................................51

# TABLE OF AUTHORITIES

## CASES

*Allen v. Green, et al.*,
  229 Va. 588, 331 S.E.2d 472 (1985) ......................................15, 26, 36, 37, 39

*Anderson v. Delore*,
  276 Va. 251, 638 S.E.2d 307 (2009) ............................................32, 33, 34, 35

*Bryant Electric Co., Inc. v. City of Fredericksburg*,
  762 F.2d 1192 (4th Cir. 1985) ............................................................12, 13, 14

*Buckles v. Kennedy Coal Corp.*,
  134 Va. 1, 114 S.E. 233 (1922) ......................................................................29

*Burdette v. Brush Mountain Estates*,
  278 Va. 286, 682 S.E.2d 549 (2009) ........................................................47, 48

*City of Lynchburg v. Smith et als.*,
  166 Va. 364, 186 S.E. 51 (1936) ...................................................................36

*Cushman Va. Corp. v. Barnes*,
  204 Va. 245, 129 S.E.2d 633 (1963) ..............................................................40

*Firebaugh v. Whitehead, et al.*,
  263 Va. 398, 559 S.E.2d 611 (2002) ..................................................27, 37, 40

*Flanary v. Kane*,
  102 Va. 546, 46 S.E. 312 (1904) ...................................................................46

*Fraternal Order of Police Lodge No. 89 v. Prince George's County*,
  608 F.3d 183 (4th Cir. 2010) .........................................................................11

*Glynn v. EDO Corp.*,
  710 F.3d 209 (4th Cir. 2013) .........................................................................18

*Grossberg v. Travelers Indemnity Co. of America*,
  825 F. Supp. 2d 717 (E.D. Va. 2011) ................................................12, 16, 17

*Hamlin v. Pandapas*,
   197 Va. 659, 90 S.E.2d 829 (1956) .................................................18, 34, 35, 41

*Harris v. Lukhard*,
   733 F.2d 1057 (4th Cir. 1984) .............................................................................13

*Holland v. Vaughn*,
   120 Va. 324, 91 S.E. 122 (1917) ........................................................................41

*Hostetter v.   Hitchings*,
   119 Va. 131, 89 S.E. 135 (1916) ...................................................................41, 42

*Hunter v. Hume*,
   88 Va. 24, 13 S.E. 305 (1891) ............................................................................46

*King v. Norfolk and W. Rwy. Co.*,
   99 Va. 625, 39 S.E. 701 (1901) ...............................................................31, 42, 46

*Lake of Woods Associate v. McHugh*,
   238 Va. 1, 380 S.E.2d 872 (1989) ......................................................................36

*Painter, et al. v. Alexandria Water Company*,
   202 Va. 431, 117 S.E.2d 674 (1961) ........................................................37, 38, 39, 42

*Ryland Group, Inc. v. Willis*,
   229 Va. 459, 331 S.E.2d 399 (1985) ...................................................................37

*Stephen Putney Shoe Co. v. Richmond, Fredericksburg and Potomac R. Co.*,
   116 Va. 211, 81 S.E. 93 (1914) ....................................................................28, 30

*Vance v. Davis*,
   195 Va. 730, 80 S.E.2d 396 (1954) .....................................................................41

*Vodusek v. Bayliner Marine Corp.*,
   71 F.3d 148 (4th Cir. 1995) ................................................................................43

*Yukon Pocahantas Coal v. Ratliff*,
   181 Va. 195, 24 S.E.2d 559 (1943) .....................................................................32

# STATUTES & REGULATIONS

28 U.S.C. § 1291 ............................................................................1
28 U.S.C. § 1332 ............................................................................1
28 U.S.C. § 2201 ............................................................................1

29 C.F.R. § 1926 ......................................................................20, 21
49 C.F.R. § 192, *et seq* ...............................................................20
49 C.F.R. § 192 ............................................................................21

54 Fed. Reg. 45,959 (Oct. 31, 1989)..........................................20
73 Fed. Reg. 1,307, 1,310 (Jan. 8, 2010) ...................................20

Va. Code Ann. § 55-13.3 ...........................................................36
Va. Code Ann. § 8.01-389(C) .....................................................47

# RULES

Fed. R. Civ. P. 56(a)...................................................................11

## III.    JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this case under 28 U.S.C. § 1332 because the parties were citizens of different states and the amount in controversy exceeded $75,000.  The district court also had jurisdiction to grant declaratory relief in this case pursuant to 28 U.S.C. § 2201.   This Court has jurisdiction over this case pursuant to 28 U.S.C § 1291 based on the finality of the district court's following two orders: (i) the district court's order entered on November 13, 2013 granting Appellee's motion for summary judgment, denying Appellant's motion for summary judgment, and dismissing this case; (ii) the district court's supplemental order entered on December 2, 2013 declaring that the easement at issue in this case is sixty feet wide.  On December 5, 2013, Appellant filed a timely Notice of Appeal regarding the two aforementioned orders.

## IV.    STATEMENT OF THE ISSUES

A.    The district court erred by failing to give proper weight to the Virginia circuit court case interpreting the identical right of way agreement.

B.    The district court erred by granting Appellee's motion for summary judgment because there were genuine issues of material fact as to the width of the easement Appellee needed and as to the historic boundaries and uses of the easement.

C.    The district court misapplied Virginia law in interpreting and construing the right of way agreement.

D.    The district court's interpretation of the right of way agreement violates the rule against perpetuities.

1

# V.    STATEMENT OF THE CASE

This case involves a dispute over the boundaries of a right of way/easement on property owned by V. Cassel Adamson, III ("Adamson").  On September 14, 2009, Columbia Gas Transmission, LLC ("Columbia") cut an approximately twenty foot wide strip of trees and other natural brush growth on Adamson's property which Columbia claimed to be "encroachments" on its right of way. Adamson had previously refused to grant Columbia permission to clear the trees. To the contrary, Adamson had expressly directed Columbia not to clear the trees, arguing that the clearing was outside of the well-defined historic bounds of the right of way.   After Columbia cleared the twenty foot wide strip, Adamson initiated this litigation against Columbia alleging trespass and seeking compensatory and punitive damages

Adamson filed his initial complaint in the Circuit Court for Goochland County, Virginia.  Columbia removed the case to the Eastern District of Virginia, Richmond Division, and filed a counterclaim seeking declaratory judgment that its easement on Adamson's property is at least sixty feet wide.[1]   Answers to all pleadings in which a response was required were filed and received by the district court.

---

[1]  Adamson and Columbia each amended their initial pleadings, which only changed them in minor respects.

2

Columbia thereafter filed a motion to strike (i) certain references to settlement in Adamson's complaint and (ii) Adamson's claim for punitive damages. With respect to the settlement references, Adamson agreed to strike those references and the district court denied Columbia's motion to strike Adamson's claim for punitive damages. Discovery ensued, and both parties moved for summary judgment. While the cross motions for summary judgment were pending, both parties filed numerous motions *in limine*. On November 7, 2013, the district court heard argument on the cross motions for summary judgment.

On November 13, 2013, the district court issued a memorandum opinion (J.A. 284-97) and order which granted Columbia's motion for summary judgment, denied Adamson's motion for summary judgment and dismissed the case (J.A. 298). Thereafter, upon motion by Columbia, the district court entered a supplemental order declaring the easement to be sixty feet wide for the reasons identified in the memorandum opinion. (J.A. 299.)

## VI.  STATEMENT OF FACTS

**A.    Background concerning the land and pipelines.**

In 1956, Commonwealth Gas Corporation ("Commonwealth") purchased an easement over a large tract of land then owned by Frederick and Penelope McBride (the "McBrides"). (*See* J.A. 246.) The agreement between Commonwealth and

3

the McBrides was formalized in a Right of Way Agreement ("ROW Agreement"). (J.A. 246.)  The ROW Agreement does not contain an express width measurement, but it granted Commonwealth,

> the right to la[y], maintain, operate and remove a pipe line or pipe lines for the transportation of gas, oil, petroleum products, or any other liquids, gasses or substances which can be transported through a pipe line . . . with the right of ingress and egress to and from same.

(J.A. 246.)   The ROW Agreement also expressly granted Commonwealth "the right at any time to lay additional lines of pipe approximately parallel to the first line herein provided, upon the payment of the price mentioned [$241.00] for each additional line to be laid."  (J.A. 246)

In return, the ROW Agreement states that "the gas line to be laid under this grant shall be constructed and maintained below cultivation, so that the Grantors may fully use and enjoy the premises subject to the rights of the Grantee to maintain and operate said line or lines."  (J.A. 246.)  It was also agreed that the grantee would "pay for any damage that may arise from the construction, maintenance, operation and removal of said lines."  (J.A. 246.)   Finally, the recitals conclude with, "[i]t is understood that the persons securing this contract are without authority to make any agreement with respect to the subject matter hereof not herein expressed."  (J.A. 246.)

In or about 1957, Commonwealth laid one pipeline, VM-108, within the easement ("Easement").  (J.A. 230.)

4

In 1969, the McBrides' conveyed their property to the Partridge Hill Company. (J.A. 247-50.)    Partridge Hill Company thereafter created the subdivision "Partridge Hills" and sold lots to private parties to build residences upon. (*See* J.A. 238-40.)  In 1990 Robert Pounders and his wife purchased a lot in Partridge Hills, deriving their title to said lot from the McBrides.  (*See* J.A. 193, 237, 251-55.)  The Western side of the Pounders' property was heavily wooded except for an approximately thirty-five foot wide strip of lower growth and brush running through the middle of the wooded area, which Columbia maintained as the Easement.  (J.A. 56-62, 193, 222, 225.)  This cleared area was consistent between the Pounders' property and the neighboring property to the South.  ( J.A. 56-62, 222, 225.)

Columbia became the successor in interest to Commonwealth.  (J.A. 229.) In or about 1991, Columbia laid another pipeline, VM-109, through the property. (J.A. 230.)   When Columbia laid VM-109, it intentionally did so within the existing cleared area. (*See* J.A. 63-65, 222-23, 225-26.)

In 2005, Adamson purchased the lot directly to the South of the Pounders' property.  (*Compare* J.A. 237, *with* J.A. 245.)   A small additional, contiguous parcel was purchased by Adamson in 2007 (together with the property purchased in 2005, the "Property").  (J.A. 238-41.)   Like the Pounders' property, when

5

Adamson purchased his Property, the Western side was wooded except for a clearly delineated path. (J.A. 70-71, 222-23, 225-26.)

**B.    Actions giving rise to the underlying dispute.**

Beginning in 2007 or 2008, Columbia, independently and through its attorneys at Reed Smith, LLP, began contacting Adamson requesting permission to clear "encroachments" from the area it claimed to be the Easement. (*See* J.A. 74-78, 259.) Adamson did not give Columbia permission to enter his property for the purpose of clearing "encroachments" and asked his father, who is an attorney, to handle the matter with Reed Smith on his behalf. (J.A. 74-78, 258.) Communications were exchanged between Reed Smith and Adamson's father, (J.A. 74-78, 258-59), but a mutually agreeable resolution was never reached. Adamson never gave Columbia permission to cut his trees or remove any "encroachments" from the Property and Columbia was well aware of this fact. (J.A. 106-07.)

On or about September 14, 2009, while neither Adamson nor his wife were on the Property, Columbia cut approximately twenty feet of trees and other natural foliage from the Western and Eastern sides of the previously cleared Easement on the Property. (J.A. 139, 210, 212.)

**C.    Facts underling Columbia's purported "need" for a sixty foot width.**

Despite the suggestion of the district court that Columbia may have acquired

6

the right to claim additional Easement property, (J.A. 292-93), Columbia claims that it has always needed a sixty foot wide Easement and that it has always had a sixty foot wide Easement. (J.A. 36.) Columbia's purported need for the Easement to be sixty feet wide, however, was: (i) not based on any knowledge or research into industry standards or requirements when the Easement was granted or the first pipe line laid, (J.A. 27-36, 153-54,) (ii) not determined until after Adamson's trees were cut, (*Compare* J.A. 157-59, *with* J.A. 23), and (iii) inconsistent and contrary to Columbia's testimony, (J.A. 166, 168).

First, Stanley Parrish, Columbia's expert designated to provide the technical reasons behind Columbia's claim of a sixty foot wide Easement, testified that he had not done any research into and was not familiar with the requirements or standards for pipeline operation and maintenance in or around 1956. (J.A. 153-54.)

Second, Columbia's purported need for a sixty foot wide Easement could not have been the reason it cut Adamson's trees. On September 25, 2009, approximately ten days after Columbia cut the trees on Adamson's Property, Columbia brought suit against the Pounders (*Columbia Gas Transmission, LLC v. Pounders*, CL09-159 ("*Pounders*")), asking the Goochland County Circuit Court to

declare that Columbia had the right to cut the Easement to a width of sixty feet on their property.[2]  (*See* J.A. 222-24, 225-27, 231.)

It was not until the *Pounders* litigation began that Columbia ever determined that it needed sixty feet in width on the Easement in order to safely maintain the pipe lines.  (*See* J.A. 157-59.)  Parrish, Columbia's expert here and in *Pounders*, repeatedly testified that he had not looked into Columbia's need until he was asked to do so during the *Pounders* litigation.  (J.A. 157-59.)  Cedric Kline, land agent for Columbia working on the Partridge Hills clearing, testified that Dana Debaets, a former Columbia employee told him before the clearing was done, that Columbia needed a sixty foot clearing.  (J.A. 89.)  In Debaets's deposition in the *Pounders* case, however, his only information on the width Columbia needed came from Parrish—which conclusion was not determined or investigated until after Adamson's trees were cut.  (*See* J.A. 157-59, 163, 215-16.)

Third, during his deposition in the present litigation, Parrish also testified that if Columbia does not have adequate space in an easement to put a spoil pile out to the side of the trench, as would be most convenient, Columbia has alternatives.  (J.A. 166, 168.)  In these circumstances, Columbia can—and has—

---

[2] The Pounders had been successful in preventing Columbia from cutting their trees because they had the ability to have their property guarded at all times—a luxury Adamson did not have.  (J.A. 222-24, 225-27.)

purchased temporary easements or moved spoil piles up or down the easement. (J.A. 166, 168.)

## VII.  SUMMARY OF ARGUMENT

Applying the district court's decision, Adamson cannot know with any degree of certainty where Columbia's rights on his property begin and end. While the district court found, at the time it decided the case, the Easement was sixty feet wide, it went out of its way not to limit the Easement to sixty feet.  There is, in fact, no limit to the Easement under the district court's opinion.[3]  While there is no limit in the court's opinion to the amount of Property Columbia can take, there is also no limit to the time within which it can take that Property (i.e., no limit to the time within which it can exercise a right to take).  Thus, the district court has rendered Adamson's property so indeterminate that if he should ever sell his property, he could not know what—if anything—he is selling and a buyer could not know what—if anything—she is buying.  Furthermore, because of this uncertainty in the language, the district court's construction causes the ROW Agreement to violate the rule against perpetuities.

Property rights must be more definite than how the district court has interpreted the ROW Agreement to allow them to be here.  To be valid, transfers of

---

[3] The district court, in a footnote, acknowledges the implicit finding that the Easement is ever-expanding depending upon the number of pipe lines Columbia chooses to install.  (J.A. 294.)

interests in property must be definite enough to give notice of ones rights in the land, so they cannot be implicitly capable of expansion without notice (granting new rights) for centuries to come. Consistent with the evidence and Virginia law, the only way to give proper definition to the parties' respective property rights is to limit the Easement to the approximately forty foot wide strip of land that had been cleared and maintained prior to 2009.

The error in the district court's opinion is derived from the fact that it essentially relies on two incorrect theories: (i) Columbia's purported need is of some significance in determining the boundaries of the undefined Easement; and (ii) reference on plat maps to an easement width of sixty feet somehow creates a right on behalf of Columbia or manifests some intention of the original grantors, the McBrides. Based upon these faulty premises, the district court gives improper weight to meaningless and unsupported evidence while wholly disregarding the proper evidence.

Had the district court performed the proper analysis under Virginia law, it would have and should have reached the same conclusion as the Goochland County Circuit Court did in *Pounders*. The *Pounders* decision concerns the same grantor-grantee and the identical ROW Agreement and should have been followed by the district court.

## VIII.  STANDARD OF REVIEW

This Court "review[s] de novo a district court's award of summary judgment, viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party." *Fraternal Order of Police Lodge No. 89 v. Prince George's County*, 608 F.3d 183, 188 (4th Cir. 2010).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a).

## IX.  ARGUMENT

**A.      The district court did not give proper weight to the Virginia circuit court decision that construed the same Easement.**

*Columbia Gas Transmission, LLC v. Pounders*, No. CL09-159, construed the very same language from the very same ROW Agreement at issue in this case. In *Pounders*, the circuit court in Goochland County, Virginia, found that the ROW Agreement was ambiguous with respect to the width of the Easement, that the intent of the original parties' controlled, and that the intent was to limit the width of the Easement to what had previously been taken and maintained as the Easement—approximately thirty-five feet wide on the Pounders' property.  (J.A. 193-97, 199, 227.)    An appeal of the circuit court's decision was subsequently denied by the Supreme Court of Virginia.  (J.A. 200-01.)

11

Here, however, the district court found, based on the language in the ROW Agreement, the Easement on Adamson's Property is not static and can be expanded.  (J.A. 292, 294-95.)  While the court found the Easement presently to be sixty feet wide, it did not limit the easement to that width.  (*See* J.A. 292-95.)  No Virginia case supports the district court's interpretation of the language used in the ROW Agreement,[4] and its decision fails to give proper weight to *Pounders*' statement of Virginia law.

1.    <u>Virginia law is controlling</u>.

When a federal court sits in diversity, as the district court did in this case, the applicable state's law controls the court's decision.  *Bryant Elec. Co., Inc. v. City of Fredericksburg*, 762 F.2d 1192, 1193 (4th Cir. 1985) ("Because this is a diversity case, we must decide this issue as we believe the Supreme Court of Virginia would decide were it faced with the issue."), *Grossberg v. Travelers Indemnity Co. of America*, 825 F. Supp. 2d 717, 721 (E.D. Va. 2011) ("[A]s a federal court sitting in diversity, it is not the role of this Court to develop a state's common law, no matter how convincing an argument in favor of such developments may appear.").  Here, the district court failed to follow the existing law of Virginia in reaching its decision.

---

[4] *See also* Argument *infra*, § C.

12

2.   Because there is no Virginia Supreme Court decision on point, the district court should have given weight to the *Pounders* decision.

While only pronouncements from the Virginia Supreme Court constitute binding precedent on federal courts, when there is no Virginia Supreme Court precedent on point, federal courts are directed to give consideration and weight to Virginia's lower court decisions that are on point. *See Harris v. Lukhard*, 733 F.2d 1057, 1082 (4th Cir. 1984) ("If, as here, the highest court of the state has not addressed the issue, a federal court should attribute some, but not controlling, weight to the state's lower courts' interpretations of the state statute in question."). This Court has explained that while "such lower court opinions, particularly if unpublished, are not binding on the Virginia Supreme Court or on this Court, these decisions 'are entitled to consideration as an indication of what state law is . . . .'" *Bryant Elec. Co., Inc.*, 762 F.2d at 1194 (quoting Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction § 4507 (1981)).

Here, there is no Virginia Supreme Court precedent on point. Columbia has not cited (nor is the undersigned aware of) any Virginia Supreme Court case interpreting language in a grant like that in the ROW Agreement. Specifically, there is no authority from the Virginia Supreme Court addressing whether the express grant of an easement affording multiple line installations, but which is nonetheless acted upon at a time certain and constructed (to which construction the grantor acquiesces), can later in time be physically expanded (based upon the right

13

to multiple line installations) without having been expressly granted right of physical expansion. Furthermore, counsel is not aware of any Virginia Supreme Court precedent addressing whether merely the right to "operate" and/or "maintain" justifies the future physical expansion of an easement.

Because the Virginia Supreme Court has not interpreted language similar to that used in the ROW Agreement and has not decided a case with even similar facts, the district court should have given "some weight" to the *Pounders* decision. *Bryant Elec. Co., Inc.*, 762 F.2d at 1194 ("[W]hile such decisions were not controlling, the federal court should attribute some weight to the state's lower courts' interpretation of the state statute in question."). Instead, however, the district court attributed no weight to the *Pounders* decision and, without any articulable basis, found that "[w]hile the two easements have a similar genesis, they involve different parties, tracts of land and a divergent analytical approach by the trial court." (J.A. 295.) This sentence illuminates some of the factual and legal misunderstandings of the district court.

First, there are no "two easements" at issue in *Pounders* and the case at bar. Both cases involve the exact same (one) easement, which is derived from the exact same—not "similar"—ROW Agreement (the "genesis" to which the district court referred). (*See* J.A. 193, 222, 225, 237, 245, 251-55.) Second, while it is true that the Pounders and Adamson are different parties and own different lots, the

14

properties are adjoining, and both took title to their properties from the McBrides—the original grantors. (*See* J.A. 193, 222, 225, 237, 245-46.) If intent is dispositive of a certain easement's width, as the *Pounders* court found it would be in the ROW Agreement (J.A. 194-95), the relevant intent is that of the original parties to the grant.[5] *Allen v. Green, et al.*, 229 Va. 588, 593, 331 S.E.2d 472, 475 (1985). Here, they are the same as they were in *Pounders* (i.e., Commonwealth and the McBrides). Furthermore, while it is conceivable that differences in the two tracts of land could be relevant in determining need, Columbia argued that it needed sixty feet in *Pounders*, just as it does here. (J.A. 198.) Indeed, the *Pounders* court found Columbia's evidence of a need for sixty feet was persuasive, yet irrelevant under Virginia law. (J.A. 198-99 ("The court does not doubt that federal requirements may require a 60 foot right of way . . . However, . . . [i]f Columbia requires more [property than was originally cleared], then its remedy is to either purchase additional property or condemn it.").) Moreover, the district court made no factual finding or legal ruling as to why a difference in the land ownership is a material distinction that could affect the bounds of one easement. (*See* J.A. 295)

---

[5] The intentions and actions of subsequent owners have no importance in this case. The district court seemed to be confused on this point and on the conveyance history of the property. *See* Argument *infra*, § C(5)(b)

Finally, the district court's statement that the *Pounders* court took a "divergent analytical approach" necessarily implies that there is Virginia Supreme Court precedent on point. As discussed *supra*, there is not and the district court did not point to any in its opinion. This statement is made more doubtful because the *Pounders* decision was found to be without reversible error by the Virginia Supreme Court. (J.A. 200-01.) Although the district court found the denial of appeal to have "little precedential value", (J.A. 295), when the denial is in a case nearly identical to the one at bar, there is value to it.

In *Grossberg*, the Eastern District of Virginia was tasked with interpreting language in an insurance policy that had not been interpreted by the Virginia Supreme Court. *Grossberg*, 825 F. Supp. 2d at 722. There was, however, a Virginia circuit court case that construed the identical language and the Virginia Supreme Court denied the petition for appeal of the circuit court's finding. *Id*. at 722-23. The *Grossberg* court found this to be influential to its decision.

> [T]he Court must give due consideration to Elkins as a decision of a lower court in Virginia. Such weight is entitled to additional deference because the Supreme Court of Virginia refused to grant a petition for appeal in Elkins, noting that it found 'no reversible error in the judgment.' Because it is this Court's obligation to determine how the highest court of Virginia would rule, such a refusal to hear the appeal lends considerable weight to its persuasive value in this context.

*Id.* at 723 (internal citations omitted). While the *Grossberg* court noted that neither decision was precedent, both should be given "due weight" in determining how the Virginia Supreme Court would resolve the question. *Id*. at 723 n.6.

The similarities here with the *Pounders* case are even greater than the similarities between the circuit court case in *Grossberg* and *Grossberg*. Not only did the *Pounders* court interpret the identical language at issue here, but it interpreted the identical document. (*See* J.A. 193, 222, 225, 237, 245, 251-55.) Indeed, the only difference between the facts in *Pounders* and those available here is that the Pounders successfully kept Columbia from cutting their trees in 2009, so the boundaries of the historically cleared area were more readily apparent. (J.A. 197, 199.) Here, however, Adamson filed a Motion *in Limine* for Adverse Inference based on Columbia's Spoliation of Evidence ("Spoliation Motion") (J.A. 217), had photographs of the 1992 clearing and of the Property before and after the 2009 clearing (J.A. 56-62, 170-84) and other evidence (J.A. 51-52, 63-65, 188) that depicted the historically cleared area on his Property.

The district court's attempts to distinguish the *Pounders* decision are meritless. Consequently, its failure to give it any weight in the analysis was error. *See Grossberg*, 825 F. Supp. 2d at 721 ("[I]f no state case is directly on point, ***the court must determine what rule the states supreme court 'would probably follow, not fashion a rule which we, as an independent federal court, might consider***

17

*best*.'  To that end, decisions of a state's lower courts ought to be given due consideration in the analysis." (emphasis added) (quoting *Kline v. Wheels by Kinney, Inc.*, 464 F.2d 184, 187 (4th Cir. 1972)).

**B.    The district court erred by granting summary judgment for Columbia because there were disputes of certain material facts.**

Even if this Court finds that *Pounders* was given all required consideration and weight, the evidence presented by Adamson and by Columbia created genuine issues of material fact which should have been submitted to and decided by the jury.  First, the evidence created a question as to the material fact of the easement width needed by Columbia, or what is "reasonably sufficient for the accomplishment of [the expressed] object" of the Easement.  *Hamlin v. Pandapas*, 197 Va. 659, 664, 90 S.E.2d 829, 834 (1956).  Second, there was a dispute as to the related yet more specific material fact of the width of the Easement in 1956.

1.    <u>There was a dispute as to the width which Columbia purportedly needed.</u>

In order for the district court to have ruled on summary judgment that the Easement is sixty feet wide, as it did, it must have found that no reasonable fact-finder could conclude that Columbia needed anything other than sixty feet.  In determining whether a genuine issue of material fact exists, the district court, as well as this Court, must "view the facts and draw all reasonable inferences in the light most favorable to the non-moving party."  *Glynn v. EDO Corp.*, 710 F.3d

209, 213 (4th Cir. 2013).  The evidence established a genuine dispute as a matter of law, so it was improper for the question of what was reasonably sufficient to have been decided on summary judgment.

a.    <em>Columbia's claimed need lacks foundation.</em>

Throughout the litigation, Columbia has claimed that it has always needed an easement with a sixty foot width in order to comply with regulations and safely maintain the pipe line(s).  (J.A. 36.)  Whether there was one pipe line or two pipe lines, Columbia has claimed that sixty feet were always necessary.  (J.A. 36.) Despite this claim, Columbia's expert, Stanley Parrish, never reviewed or studied the standards and/or regulations that were in effect when the original pipe line (VM-108) was installed.  (J.A. 153-54.)

Adamson has contested Parrish's testimony as evidence of the width needed by Columbia, chiefly by arguing that there was no foundation whatsoever for Parrish's opinion that Columbia and its predecessor have always needed sixty feet. In its memorandum opinion, the district court observed, "Although Parrish conceded that he had not specifically reviewed the industry standards in effect in 1956 when the right of way was dedicated, he stated unequivocally that based on his training and thirty years of experience, a sixty foot width had always been required." (J.A. 293-94.)  The statement itself casts doubt on the foundation of the evidence, doubt which created an issue of material fact for the fact-finder to

decide. Since the issue of what Columbia needed to operate its gas lines is certainly a material fact in this case which was in dispute, the district court erred by granting summary judgment.

> b.    *Columbia's evidence of need is contrary to its undisputed actions for decades*.

Another way in which Columbia's need was disputed is that Columbia's position that it has always needed a sixty foot wide easement necessarily implies that neither Columbia nor its predecessor took what was needed for nearly half a century. If sixty feet had really been required since the first pipe line was installed in 1956, sixty feet would have been taken at that time.

In support of its need for sixty feet in width, Columbia cites 49 C.F.R. § 192, *et seq*. and 29 C.F.R. 1926, Subpart P, § 1926.652(b)(1)(i) and (ii), which regulate the operation and maintenance of natural gas pipe lines and direct planning protocols. (J.A. 27, 29.) Both regulations, however, came into existence well after 1956 (when the Easement was granted) and well before 2009 (when Columbia expanded the width of the Easement). 49 C.F.R. § 192, *et seq*. did not come into effect until at least 1989, *see* 54 Fed.Reg. 45,959 (Oct. 31, 1989), and 29 C.F.R. 1926, Subpart P was not introduced until 1970, *see* 73 Fed.Reg. 1,307, 1,310 (Jan. 8, 2010). Thus, neither regulation supports Columbia's position that it has always needed sixty feet. Moreover, assuming *arguendo* this Court finds it proper under Virginia law to allow the expansion of an existing easement based on subsequently

enacted federal regulations, which Adamson expressly disputes, Adamson presented evidence that Columbia did not clear the additional property in or around either 1970 or 1989.  (*See* J.A. 51-52, 56-62, 63-65.)

Finally, the district court suggests that Columbia may have acquired the additional easement property in 1992 when it laid VM-109.  (J.A. 292-93.)  In doing so, the district court implied that this would be proper under Virginia law even though no support exists or was cited for this implication.   Even if support did exist, Columbia did not take sixty feet of property for the Easement in 1992 either.[6]  (J.A. 56-62 (photographs taken in 1992 of the installation of VM-109), 51-52 (testimony concerning the photographs).)    Indeed Columbia's 1990 Construction plat expressly states that, in laying VM-109, Columbia will stay within the existing easement (i.e., it did not need more property).  (J.A. 63-65.)  Therefore, the laying of the additional pipe line in 1992 also does not support either Columbia's position that it always needed sixty feet or that this action triggered Columbia's need in 2009.

Whether the need arose in 1956, 1970, 1989, or 1992, Columbia or its predecessor would have taken the land at that time, but would have continued to maintain the Easement at that width.  Because a pipe line has been operating and

---

[6] That Columbia did not take an additional twenty feet in 1992 is also significant because by this time, both federal regulations (49 C.F.R. § 192 and 29 C.F.R. 1926, Subpart P) were in force.  Had these regulations truly been the reason for Columbia's taking an additional twenty feet, it would have done so in 1992.

maintained since approximately 1957, if a sixty foot clearing was always necessary for the maintenance and operation of the pipe line(s), it would be illogical for Columbia or Commonwealth not to have taken and continued to maintain what it considered necessary.

Columbia's evidence of what it reasonably needs to accomplish the express purposes of the Easement (to the extent it is even relevant, which Adamson expressly disputes) is contradicted by the evidence of prior conduct. Although the district court should have considered Adamson's Spoliation Motion and his other evidence of the original taking, even without this evidence, there was still a genuine issue of material fact as to Columbia's reasonable need.

The evidence of Columbia's prior maintenance activities on the Easement are the best evidence of Columbia's true need. *See* Argument *infra*, § C. While the district court emphasized that Virginia law does not, in some circumstances, require an easement holder to immediately exercise its' full rights granted, (J.A. 286), when the questions to be determined are ***whether*** its exercise of those rights is "reasonably necessary" and ***when*** its exercise of those rights became "reasonably necessary," past conduct by that party is more probative than any other evidence available. Even if this Court finds that this evidence is not applicable to the determination of what rights the parties' have, it is certainly probative to Columbia's opinion of what it reasonably needs.

Regardless of when the need for sixty feet allegedly or arguably arose, there has been no claim, suggestion, reason, or finding that the need arose in or around 2009, when Columbia cut the trees. While Columbia maintained an approximately forty foot wide Easement, it admits that it had not maintained sixty feet on Adamson's Property prior to 2009. (J.A. 101.) Therefore, there is a genuine dispute of material fact regarding Columbia's purported need even without Adamson's evidence of the original clearing width.

    c. *Columbia's evidence of need is internally inconsistent and clearly pretextual.*

Parrish provided Columbia its only evidence of need. Parrish, however, repeatedly admitted that he did not determine that a sixty foot width was necessary until he became involved in the *Pounders* case, which was not commenced until approximately ten days after Adamson's trees were cut. (*Compare* J.A. 157-59 (stating the first time Columbia's expert looked into the width required on the Easement in Partridge Hills was after the *Pounders* case began), *with* 223 (stating the *Pounders* case was filed September 25, 2009).) The only other evidence of Columbia's need came from Cedric Kline, land agent for Columbia in 2009, who testified that his supervisor, Dana Debaets, told him that the Easement needed to be sixty feet wide. (J.A. 89.) Kline did not inquire further of Debaets. (J.A. 89-91.) Even if he did and even if Debaets was disclosed as a witness for Columbia in this case, his deposition from the *Pounders* case reveals that he too had no independent

23

evidence of Columbia's need. (J.A. 215-16, *see also* J.A. 163 (Parrish stating he was the only one he was aware of who had done the "need" calculations for the Easement in Partridge Hill).)  As the only justifications for Columbia's purported need for sixty feet were not formed until after Adamson's trees were cut, the timing is evidence of pretext.

Additionally, Parrish's testified that if Columbia's easements were not wide enough to trench and lay spoil piles conveniently, Columbia had alternatives. (J.A. 166, 168.)  Parrish testified that Columbia could move spoil piles up or down the existing easement or Columbia could purchase temporary right of ways.  (J.A. 166, 168.)  Although Parrish expressed that having to take these measures was "less than ideal," they are viable alternatives which call into question the material fact of Columbia's need for sixty feet.  (J.A. 168. )

2.    There was a dispute as to the historic width of the clearing.

The district court ignored Virginia precedent which demands that if the words of a grant are not specific enough to describe a grant, the court must then look at the conduct and action of the parties at the time of the grant.  *See* Argument *infra*, § C(5).  That being the case, the district court erred by not considering the evidence proffered by Adamson to show the original parties' conduct.  The parties' conduct and the most germane question to have been answered is what was taken and what was allowed to be taken in 1956.  The physical taking along with the

24

words of the grant are the best evidence of the parties' intent. *See id*. Rather than considering this evidence, the district court mislabeled it as silent and instead applied a purpose that did not present itself until fifty-one years after the grant.

Adamson offered a construction map which was prepared by Columbia in preparation for installing VM-109 and on which Columbia states that it would keep "construction to existing [right of way]." (J.A. 63-65.) Obviously this is an admission on the part of Columbia that at least in 1992, it was aware of the specific dimensions of the Easement it acquired by the 1956 ROW Agreement. Coupled with the photographic evidence offered by Adamson of the width which Columbia cleared in 1992, the evidence established proof of the original taking of the original parties. (J.A. 51-52, 56-62.) The photographs provide credible evidence that Columbia cleared an area of consistent width along both the Adamson and Pounders properties, which the construction plat shows what the existing easement prior to 1992. Adamson also submitted the affidavit of Robert Pounders who was prepared to testify that he could identify the area originally cleared. (J.A. 222, 225.) Since the Pounders easement had been adjudicated to be approximately thirty-five feet wide, it is certainly plausible for a reasonable fact-finder to have relied upon the photographs to determine that Columbia only claimed approximately forty feet in its 1992 clearing of the Easement. The district court erred, then, in observing that "Adamson has offered . . . only scant, somewhat

25

impressionistic, evidence of the 1992 taking." (J.A. 295.) Because Adamson's evidence of the extent of the 1992 taking and the testimony of Robert Pounders raise a genuine dispute as to the material fact of the Easement's historic width, summary judgment was improper.

       3.      <u>It was improper to decide the factual question at the summary judgment stage</u>.

The evidence of the 1992 taking, Robert Pounders' affidavit, photographs, the construction map, Columbia's past conduct, combined with Columbia's admissions and the wholly unsupported expert opinions amount to more than a "scintilla of evidence" from which a rational fact-finder could determine that the Easement was and is fewer than sixty feet wide. Thus, before the district court was evidence that created a genuine issue of material fact, and it was error for the court to have decided the matter on summary judgment.

**C.    The district court's construction of the ROW Agreement does not comport with Virginia law and renders it void.**

"It is elementary that when language in a deed or other instrument is to be construed, '[t]he grantor's intention, as expressed in the instrument, must prevail unless contrary to some principle of law or rule of property.'" *Allen*, 229 Va. at 593, 331 S.E.2d at 475 (quoting *Austin v. Dobbins*, 219 Va. 930, 936, 252 S.E.2d 58, 592 (1979)). Here, the district court found that the ROW Agreement created an Easement with a mutable width. (J.A. 292-95.) The court suggested that the width

26

could increase with the installation of additional pipe lines. (J.A. 292-93 ("The width necessary to safely accommodate the additional pipelines would logically be determined at the time of installation, depending on the number installed.").) The court also suggested that the width could increase based on federal regulations and/or changing industry standards without the installation of additional pipe lines. (J.A. 293.) Virginia law, however, does not allow for such an indefinitely expandable easement. (*See* J.A. 293 (district court opinion cites only to Sixth Circuit law concerning right to expand based on federal regulations), 198-99 (Goochland County Circuit Court finding Columbia's desire to comply with federal regulation irrelevant under Virginia law).) Indeed, by interpreting the ROW Agreement to allow for an inherently indeterminate and ever-expanding Easement, the district court improperly rendered the ROW Agreement void under Virginia law.

1. <u>Virginia law requires property rights to be sufficiently certain such that they provide notice.</u>

Underlying every case that construes the terms of an easement or other interest in land is the notion that property rights must be reasonably certain to be binding. *See Firebaugh v. Whitehead, et al.*, 263 Va. 398, 403, 559 S.E.2d 611, 615 (2002). In order for such rights to be reasonably certain, there must be a means of being on notice of such rights. *See id.* ("The description of the subject property must be sufficient 'to afford the means, with the aid of extrinsic evidence,

of ascertaining with accuracy what is conveyed and there it is.'" (quoting *Smith v. Bailey*, 141 Va. 757, 768, 127 S.E. 89, 93 (1925)).  In order to determine if there is reasonable notice of such rights (i.e., to determine if the grant is valid and enforceable), Virginia courts look to two sources: the language used in the grant, and if that language is ambiguous, courts can then also look to evidence of the intent of the original parties to determine what was meant by the ambiguous language used.  *See Stephen Putney Shoe Co. v. Richmond, Fredericksburg and Potomac R. Co.*, 116 Va. 211, 216, 81 S.E. 93, 96 (1914).

> a.  *The legal framework under Virginia law*.
>
>> i.  If the language of a grant is not ambiguous or uncertain, the grantee gets what the language conveys (i.e., what is reasonably sufficient to accomplish the expressed object).

To find that the grantee gets what is reasonably necessary to fulfill the expressed object of the Easement, (J.A. 292), is merely another way to say that there is no ambiguity in the ROW Agreement.  When there is no ambiguity in the language used, the express language always controls.

> Where an easement has been granted or reserved by deed, the ordinary rule which governs in the construction of other writings prevails, namely, that the rights of the parties must be ascertained from the words of the deed, and the extent of the easement cannot be determined from any other source.

*Stephen Putney Shoe Co*., 116 Va. at 216, 81 S.E. at 96.  If there is no ambiguity in the grant, the rights of the parties are reasonably knowable from the writing alone.

The rights of parties may be reasonably certain even when the dimensions of an easement are not provided so long as there are other terms that give reasonable notice of ones' rights in the land.

For example, in *Buckles v. Kennedy Coal Corp.*, 134 Va. 1, 114 S.E. 233 (1922), the Virginia Supreme Court found that a right of way that expressly conveyed the right to build a standard gauge railroad was "sufficiently definite in [its] terms, with respect to the width of the right of way, to authorize the appellee to first construct and operate a narrow gauge and subsequently a standard gauge railroad." *Id*. at 18, 114 S.E. at 238. Because the purpose of the easement (to construct and operate a standard gauge railroad) carries with it a certain defined width, the court found that the conveyance was valid. Stated differently, because the purpose of the easement, by itself, defined the width with reasonable certainty and thereby gave notice of what was conveyed, it was not so indefinite to make it unenforceable and void. *See id*.

Here, unlike in *Buckles*, the language used in the ROW Agreement does not give reasonable notice of what was conveyed. Here, as the district court properly pointed out, the ROW Agreement "[c]learly . . . contemplates the possible installation of additional pipelines," (J.A. 292), yet it also does not say how many. Thus, as opposed to the facts in *Buckles* where there was only one objective, here there is no means of determining the dimensions of the easement from the

language of the ROW Agreement alone. *Buckles* remains the only authority of which counsel is aware wherein the Virginia Supreme Court has endorsed the notion that the width of an easement can be exclusively determined based on the purpose expressed. Therefore, consistent with the overarching purpose of sufficiently defining rights, to give effect to language alone, that language must be reasonably definite so as to provide notice of rights and render the grant valid.

> ii.  If the language of a grant is ambiguous or uncertain, the intent of the original parties governs.

If the granting language is not sufficient to give reasonable notice of the parties' rights, the court must look to the intent of the original parties to determine what the language conveys. "[W]here [] language is ambiguous, the court in order to ascertain the intention of the parties looks to the language employed in the light of the circumstances surrounding the parties and the land at the time the deed was executed." *Stephen Putney Shoe Co.*, 116 Va. at 216, 81 S.E. at 96. Thus, even if the grant contains an express purpose, if the purpose language itself is insufficient to identify the rights of the parties, it cannot independently define the dimensions. *See* Argument *infra*, § C(2). The court must look to parole evidence to determine intent.

Columbia argued and the district court seemingly agreed that when the purpose is expressed, it always controls. (J.A. 291 ("Virginia courts typically look to the intent of the parties only when the easement lacks language specifying its

purpose.").)  This is simply not an accurate statement of the law in Virginia.  *See King v. Norfolk and W. Rwy. Co.*, 99 Va. 625, 629, 39 S.E. 701, 703 (1901) ("The intention of the parties to the instrument is of controlling efficacy.").  Purpose only governs when, as explained *supra*, the purpose has independent significance that defines and creates notice; purpose only has relevance when it helps define the intent of the original parties at the time of the grant.  As explained more fully below, Virginia law has limited this latter application to evidence of past use—not, as the district court permitted here, present day purpose with no relation to the original parties' intent.  Under the facts of this case where there is evidence of intent from the language used in the ROW Agreement and the circumstances and past use of the Easement, it was error for the present-day purpose to have dictated the decision.

> b.    *The ROW Agreement is uncertain and ambiguous in terms of its dimension, but it is clear on other subjects.*

The ROW Agreement does not contain an express width of the Easement. (*See* J.A. 246.)  It expressly permits the grantee to lay additional pipe lines, (*see* J.A. 246), however, and quite significantly, the ROW Agreement does not provide for any physical expansion of the Easement.  (*See* J.A. 246.)  As well as not providing for physical expansion, the grant concludes by stating that "it is understood that the persons securing this contract are without authority to make any agreement with respect to the subject matter hereof not herein expressed."

(J.A. 246.) From this language, the district court concluded that the parties had provided for physical expansion of the Easement.

The district court's conclusion is not supported by Virginia law. Virginia courts follow the construction principle *expressio unius est exclusio alterius*. *See Yukon Pocahontas Coal v. Ratliff*, 181 Va. 195, 203, 24 S.E.2d 559, 563 (1943). Under this maxim, the expression of a particular subject along with the exclusion of other subjects implies an intention to exclude those subjects not mentioned. Application of this principle to the plain words used in the ROW Agreement evidences an intention by the original parties to allow for the installation of additional pipe lines so long as the grantee does not take or clear more land. Thus, the district court committed error when it interpreted the right to lay additional pipe lines included a physical expansion of the Easement. Had physical expansion been intended, the ROW Agreement would have provided for it.

2.    The district court improperly relied upon *Anderson v. Delore*.

The underpinning of the district court decision is *Anderson v. Delore*, 276 Va. 251, 638 S.E. 2d 307 (2009). The district court's reliance upon *Anderson*, however, is misplaced. After *Anderson* is stripped away, the district court's opinion is legally unsupportable and the decision should be reversed.

*Anderson* involved access rights by property owners at Smith Mountain Lake. *Id.* at 254, 683 S.E. 2d at 308. Adjoining property owners were granted an

"easement of right of way appurtenant to the aforesaid lot over and across the strip of land [between the property and Smith Mountain Lake] for the purpose of securing access to Smith Mountain Lake from the aforesaid property." *Id.* There were no dimensions provided for the right of way. *See id*. One property owner sought to enjoin the other's access to the lake edge property adjoining their respective lots. *Id.* Significantly, the parties presented no evidence as to prior grantor-grantee intent or historical prior use or non-use. *See id*. at 258, 683 S.E.2d at 310. Instead, the party seeking the injunction relied upon self-created "extended lot lines" to establish their property rights. *Id.*

*Anderson* recites the general Virginia test for determining the dimensions of an undefined easement. *Id.* at 257, 683 S.E.2d at 310. Specifically *Anderson* recites the rule of construction including a passage from *Hamlin*, which states that dimensions of an easement may be inferred to be such that are reasonably sufficient for accomplishment of recited purpose of the easement. *Id.* (quoting *Hamlin*, 197 Va. at 664, 90 S.E. 2d. at 834).

The district court places an undue and inaccurate interpretation on this particular quote. The recitation of the rule to be employed to determine boundaries of an easement is in fact only *dicta* in the *Anderson* opinion since the *Anderson* court expressly declined to determine the dimensions of the disputed easement. *Id.* at 259, 683 S.E. 2d. at 311. Furthermore, even though a purpose was expressed in

33

the grant, the *Anderson* court did not even look to the expressed purpose to determine intent, but required the moving party to produce any evidence on the original grantor-grantee intent. *Id*. at 258, 683 S.E.2d at 310. The moving party failed to do so and the record was devoid of any evidence of historic use and acquiescence.

Notably, the *Anderson* court sought inquiry into evidence of like conveyances and transactions, suggesting that such evidence could be used as evidence of the original grantor-grantee intent. *Id*. In *Anderson*, however, there was no such evidence. In the case before this Court, the district court had available the *Pounders* decision, which involved the identical grantor-grantee and the identical easement.

Additionally, because the language taken from *Anderson* to support the district court's decision comes from *Hamlin* and because the Virginia Supreme Court in *Hamlin* actually determined an easement boundary, *Hamlin*, 197 Va. 666, 90 S.E.2d 835, the district court should have followed the analytical rubric of *Hamlin* rather than non-contextual *dicta* from *Anderson*.

An examination of *Hamlin* reveals the importance of the temporal component of the "inferred to accomplish a purpose" principle. *Hamlin* contains copious evidence of prior use and acquiescence, and even had the last living party to the original grant testify. *Id*. at 665, 90 S.E. 2d at 834. Thus, the *Hamlin* court

34

engaged in an inquiry about how the easement in question had been created and originally used.  The legal notion of "purpose" referred to in *Anderson*, in part, created by *Hamlin*, must relate back to the original creation and use.

The district court committed error by failing to consider or recognize the importance of evidence of the historic use for the Easement and improperly considered Columbia's "purpose" which did not exist until fifty-one years after the grant.  Moreover, had the district court properly applied *Anderson* (since Columbia only presented evidence of present need, *see* Argument *infra*, § B(1)(a)), the district court should have denied Columbia's Motion for Summary Judgment since it proffered and had no evidence of intent from 1956.  The district court further erred when it was not guided by the *Anderson* court to look at the *Pounders* decision.  *See also* Argument *infra*, § A.

3.    The district court's construction of the ROW Agreement and its application of the law create impermissibly uncertain rights.

For the Court to find, as the district court implicitly did below, that the grant language allows for future expansion without any temporal of geographic limitation, necessarily means that the McBrides intended to grant Commonwealth an easement that could encompass their entire piece of property.  Without any limitation on the amount of property that could be taken or the time in which property could be taken by the grantee, the district court construed the Easement to

be tantamount to the McBrides conveying their entire property in fee simple to the grantee. Virginia law does not favor such construction.

> If the city, under the terms of its easement, can lay this additional new cast iron pipe line at this time, it could lay another next year, or twenty years hence, *ad infinitum*, and thus break up and destroy the uses of the landowners' property for a consideration, which, as shown by the easements are *de minimis*, and although under the easement and in accordance with the law, they are only permitted to use the property without owning it as fee simple owners.

*City of Lynchburg v. Smith et als.*, 166 Va. 364, 372, 186 S.E. 51, 55 (1936). The hypothetical expressly rejected by the Virginia Supreme Court in *City of Lynchburg* is exactly what the district court allowed its interpretation to do here. Taken to its logical limits, the district court's interpretation of the ROW Agreement creates a *de facto* illegal restraint on alienation since Columbia could conceivably need the entire Property at some point and thereby render the Property valueless. Thus, it was error for the district court to interpret the ROW Agreement to violate principles of Virginia property law as it did. *See Allen*, 229 Va. at 593, 331 S.E.2d at 475.

4. The district court's construction of the ROW Agreement violates the rule against perpetuities.

In construing the ROW Agreement, the district court failed to take into consideration the common law rule against perpetuities ("Rule") that existed in

1956.[7]  The Rule that existed at the time of the grant stated that, in order to be valid, an interest in property must vest within a period: measured by a life in being plus twenty-one years and ten months, or (ii) "if the parties are corporate entities and do not contract with reference to a life or lives in being, the determinative period is [twenty-one] years from the date of creation of the interest."  *Ryland Group, Inc. v. Willis*, 229 Va. 459, 463, 331 S.E.2d 399, 402 (1985) (citations omitted).  A grant in violation of the Rule is void *ab initio*.  *See Firebaugh*, 263 Va. at 404, 559 S.E. at 615-16.  By interpreting the ROW Agreement to have allowed the 2009 clearing (taking) and indicating that the width is subject to change based upon Columbia's need (or its right to lay additional pipe lines), the court rendered an interpretation of the ROW Agreement that makes it void under the Rule.

In *Painter, et al. v. Alexandria Water Company*, 202 Va. 431, 117 S.E.2d 674 (1961), the Virginia Supreme Court construed an easement that granted

> the exclusive right to back the waters up said Occoquan Run along
> and opposite their said lands so long as the same does not overflow

---

[7] Although Virginia adopted a "wait and see" savings provision of the Rule in 1982 (amended in 2000), it does not apply retroactively.  Va. Code Ann. §55-13.3, *see also Lake of Woods Assoc. v. McHugh*, 238 Va. 1, 7, 380 S.E.2d 872, 875 (1989).  Moreover, the Rule as it existed at the time of the grant is the relevant Rule to be applied "because the intent of the parties to a deed must be ascertained with reference to the circumstances existing at the time of its execution."  *Allen*, 229 Va. at 593, 331 S.E.2d at 475.  In order to interpret the intent of the original parties so as to not violate a "principle of law or rule of property," the principles of law and rules of property then in effect must control. *See id.*

> the banks of said stream; but with the further right, in the event of the raising of the height of said dam or the construction of a new dam across said Run, to overflow his said land without the banks of said stream for which overflowing and all damages accruing therefrom the said second party is to pay to said first parties the sum of one hundred dollars for each and every acre of bottom land so overflowed owned by said first parties.

*Id*. at 433-34, 117 S.E.2d at 677.  In looking at whether the conveyance violated the Rule, the court stated,

> If the deed vests in the grantee an immediate or present interest in the "further right" of flowage, no question of the violation of the rule against perpetuities arises.  If, on the other hand, the interest or estate in the "further right" of flowage is not intended to vest until the present dam is raised, or a new one constructed, such grant is not enforceable because this event may possibly be postponed beyond the period prescribed by the rule against perpetuities.

*Id*. at 434, 177 S.E.2d at 677.  The *Painter* court found that the future grant was valid based on the language used in the grant, which explained the existing circumstances, showed that the parties intended to convey, at the same time, the present and future flowage rights.  *Id*. at 436, 117 S.E.2d at 678.

Unlike the facts in *Painter*, the language of the ROW Agreement and the district court's construction of it here violate the Rule.  Here, the district court found the language of the ROW Agreement to implicitly allow the Easement to be expanded based on the number of pipe lines installed, which expansion would "logically be determined at the time of installation."  (J.A. 293.)  The court, however, does not limit the number or the time within which any additional pipe

38

lines would or could be installed. Additionally, unlike the language used in the ROW Agreement, the language of the conveyance at issue in *Painter* (i) described the circumstances surrounding the parties, (ii) expressly contemplated future additional takings of property, and (iii) limited the property which could be taken to "bottom land." *Compare id.* at 435-36, 117 S.E.2d at 677-78, *with* J.A. 246. Here, the circumstances surrounding the execution of the ROW Agreement were not described, there is no additional taking of land contemplated or described, and there are no boundaries described. Without defining language similar to that in *Painter*, it was error for the district court to construe the ROW Agreement to allow the width of the Easement to enlarge based upon Columbia's need.

Furthermore, given the absence of language or the circumstances existing at the time of the grant that would suggest the intent that the boundaries of the Easement would expand with future installations of pipe lines, under the cannon of construction *espressio unius est exclusio alterius*, it should not have been inferred. *See* Argument *supra*, § C(1)(b). Thus, the grant in this case is a one-hundred eighty degree departure from the grant in *Painter*.

Here, applying the rule against perpetuities to the ROW Agreement, as the district court interpreted it, creates a void grant. Because of the principle that a court must interpret instruments in a manner consistent with the law, *Allen*, 229 Va. at 593, 331 S.E.2d at 475, the district court should have interpreted it,

39

consistent with the Rule and law of Virginia, to have limited the Easement to the width that was originally taken and historically maintained.

5.    <u>The only way to render the ROW Agreement valid is to limit the Easement to the width that was originally taken.</u>

The district court's decision, under the facts of this case, creates an invalid easement because it violates the Rule and a party can neither look to the ROW Agreement or to the property to determine its rights.  Whether the district court's decision is read to allow the expansion of the Easement upon the laying of the additional pipe line and/or compliance with federal regulations, there is no time limit to such taking.  Moreover, the undisputed evidence here is that Adamson's trees were not cut until decades after any such triggering event occurred.  (J.A. 231.)  If Columbia is entitled to take whatever property is reasonably needs, yet it does not have to claim that property for nearly half a century (or seventeen years at best), there is no notice of the parties rights and the grant is too vague to enforce. *See Firebaugh*, 263 Va. at 403, 559 S.E.2d at 615.  Because the respective rights of the parties must be reasonably ascertainable to be valid, the Easement should have been limited to the width that was originally taken and maintained as the Easement.  Under the circumstances of this case, applicable Virginia law, and based on the ambiguous language of the ROW Agreement, it is the only means of providing definition to the intent of the parties to the grant.

40

Under Virginia law, "where the width of a right of way is not specified in the grant, then it is limited to the width as it existed at the time of the grant." *Cushman Va. Corp. v. Barnes*, 204 Va. 245, 252, 129 S.E.2d 633, 639 (1963). Although the district court found this statement inapplicable as applying only to roadway easements with defined widths, (J.A. 291-92), it has not been so limited by a Virginia court. While many cases citing to this language are easements of roadways, the principle conveyed by this language is simply further evidence of the underlying purpose to define easements with reasonable certainty, which is not limited to roadways.

For example, in *Vance v. Davis*, 195 Va. 730, 80 S.E.2d 396 (1954), the Virginia Supreme Court construed an easement created by a commissioner and stated

> "As a general rule, when the character of an easement is once fixed, no material alterations can be made in physical conditions which are essential to the proper enjoyment of the easement except by agreement. This applies to both the owner of the easement and to the owner of the fee."

*Id.* at 737, 80 S.E.2d at 400 (quoting 17 Am. Jur., Easements, § 112, p. 1006.).

Furthermore, in *Hamlin*, discussed *supra*, the court stated,

> where there is no express agreement between the parties with respect to the location of a way granted, but not located, the use by the grantee or owner of the dominant estate of a reasonable way, which is acquiesced in by the grantor or owner of the servient estate, sufficiently locates the way which the parties intended to create.

41

*Hamlin*, 197 Va. at 664, 90 S.E.2d at 834, *see also Holland v. Vaughn*, 120 Va. 324, 328, 91 S.E. 122, 124 (1917) ("No rule for the construction of written instruments is better settled than that which attaches great weight to the construction put upon the instrument by the parties themselves."), *Hostetter v. Hitchings*, 119 Va. 131, 134, 89 S.E. 135, 136 (1916) ("The language of the deed made in 1881 . . . and the construction placed thereon and acted upon by the grantees, and acquiesced in by the grantor for many years must determine the rights of the parties to this suit."), *King*, 99 Va. at 630, 39 S.E. at 703 ("[T]he construction placed by the parties upon the deeds at the time , , , is entitled to weight when the language employed is ambiguous and the intention of the parties is the subject of inquiry.").  While this principle has been applied to determine the width of an easement primarily in roadway cases, the principle itself is not so limited.

Although it is true that *Vance* and *Hamlin* did not expressly contemplate future objects as the ROW Agreement does here, as mentioned *supra*, the only Virginia authority validating future purposes and takings contained unambiguous language doing so.  *See Painter*, 202 Va. at 436, 117 S.E.2d at 678.  Where the language is ambiguous, as it is here, the only case on point is *Pounders*, which was incorrectly discarded.  *See* argument *supra*, § A.

      a.    *Competent evidence supports that the original taking was approximately forty feet wide.*

Perhaps because of it's minimizing the importance of the original parties' intent and circumstances evidencing such intent, the district court did not properly consider Adamson's evidence. The district court had before it, but did not properly consider Adamson's evidence supporting the fact that the trees on his Property that were cut by Columbia in 2009 had been standing since the first pipe line was installed in 1957. The court states that "Adamson has offered no probative evidence of the original taking in 1957 clearing and only scant, somewhat impressionistic, evidence of the extent of the 1992 taking." (J.A. 295.) Although it is true that there were no first-hand witnesses to the original taking, as explained *supra*, § B(2), Adamson produced evidence of the historically cleared width of the Easement. Additionally, because the true means of determining the age of the trees would require sampling from the trunk or stump, which had all been intentionally destroyed by Columbia, Adamson filed a Spoliation Motion, asking the court to grant Adamson the inference that the trees were in existence at the time VM-108 was installed and delineated an approximately forty foot wide clearing.[8]  (J.A.

---

[8] Despite being aware of Adamson's disagreement with Columbia's taking an additional twenty feet (J.A. 106-07), threatening litigation itself (J.A. 259), and communicating with Adamson's counsel (J.A. 258-59), Columbia intentionally destroyed all evidence of the trees from which samples could be acquired and scientifically dated (J.A. 83.). Under such circumstances and in order to level the evidentiary playing field, the district court should have awarded Adamson such an inference at the summary judgment stage. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)

217.)  Without ruling on the Spoliation Motion, which should have been granted, the court did not properly consider all the evidence.

b. *The district court impermissibly attributed significance to sixty foot plat notations.*

Throughout its opinion, the district court repeatedly and erroneously made reference to the fact that certain plats associated with land transfers in the Partridge Hills subdivision make reference to the Easement as being sixty feet wide.  Not only did the district court apply the incorrect law to the sixty foot notation, the opinion suggests that it did not have a firm grasp on the timing and nature of the transactions when it reached its decision.

The district court noted the transfer of the property from the McBride's to the Partridge Hill Company in 1969 and noted that a plat associated with the transfer indicated a sixty foot natural gas easement.  (J.A. 286.)  The district court then noted the transfers of Property to Adamson and made reference to the sixty foot easement being expressly set forth in the transferring deeds.  (J.A. 287.)  A review of the deeds themselves, however, reveals no mention of the Easement.  (J.A. 234-35, 238-41.)  Like in the McBride-Partridge Hill Company deed, the Easement is mentioned only as a note on the plat maps associated with the transfers to Adamson.  (*Compare* J.A. 247-250, *with* J.A. 234-35, 238-41.)

44

The district court's fundamental error in locating and noting the presence of the purported sixty foot easement in the Adamson deeds—as opposed to the plat maps—is a crucial error under Virginia law.  The record is clear that the plats associated with the transfers to Adamson contain the sixty foot easement designation, but the sixty foot designation is nowhere to be found in the deeds themselves.  (*Compare* J.A. 234-35, *with* J.A. 237; *compare* J.A. 238-41, *with* J.A. 245; *compare* J.A. 247-50, *with* J.A. 251-55.)

Further amplifying the district court's apparent confusion, the district court added a footnote indicating that "the record is silent as to whether the McBride's received any form of additional compensation when the second pipeline, VM-109, was installed in 1992."  (J.A. 292.)   Incorrectly believing that the McBrides still owned the Property in 1992, the district court converted this "fact" into a legal error by incorrectly attributing "intent" to the McBrides based upon the installation of VM-109.  (J.A. 295.)   The district court is simply wrong when it stated that the evidence of the McBrides' intent may be divined from the installation of VM-109 in 1992 and that "[e]ven if the original Agreement contemplated a forty foot easement, the plat attached to the deed of conveyance to Partridge Hills (sic), following installation of the second pipeline, clearly reflected a sixty foot

easement." (J.A. 295.)[9]  Because of the district court's factual confusion, it unclear

which transaction it even referred to when it stated that "[t]he only evidence of the

actual intent of the parties to the easement grant, aside from the document itself, is

the deed of conveyance from McBride to Partridge Hill (sic).  The attached plat

clearly depicts a sixty foot easement." (J.A. 291).[10]

.    Attributing any significance to any of the plat map notes, including the

plat map that accompanied the McBride sale deed in 1969 , where there is no

source document which establishes a sixty foot easement is without legal support

and erroneous.  Nonetheless, the district court allowed a note on a plat map to

supplant and override a detail purposefully omitted from the 1956 ROW

Agreement.  Because the intent of the parties in 1956 was the applicable inquiry, a

note on a plat map whose origin and purpose have never been established is

irrelevant. *See King*, 99 Va. at 629, 39 S.E. at 703 ("The intention of the parties to

the instrument is of controlling efficacy.").  Without any such evidence or any

record of the sixty foot dimension being acquiesced to by the McBrides and

Commonwealth, the district court should have attached no significance to the plat

---

[9] The McBrides' sold the property in question in 1969.  (J.A. 229.)  Thus, the McBrides did not own any of the Property in 1992 when VM-109 was installed. The district court attribution of intent on the part of the McBrides based upon the installation of VM-109 in 1992 was erroneous.

[10] Giving due and proper effect to the plat map notations eliminates their significance entirely and renders the district court opinion devoid of any evidence of intent other than the conveyance itself.  This poor state of affairs compels a reversal of the district court's decision.

map note. The law cannot and will not validate an error or mistake. *See Flanary v. Kane*, 102 Va. 546, 46 S.E. 312 (1904); *Hunter v. Hume*, 88 Va. 24, 13 S.E. 305 (1891).

In all cases of a transfer or mention of the sixty foot easement, the dimensional description appears as a notation on the plat and not an actual description in a deed. As discussed more fully below, Virginia law does not attach any particular weight to notations on plats that are merely attached to deeds as descriptors. Thus, the district court's conclusion that the sixty foot plat descriptors are *prima facie* evidence under Virginia Code Section 8.01-389(C) is erroneous.

Rather than consider actual physical evidence of intent and the condition of the Adamson Property prior to the 2009 clear cutting by Columbia, the district court incorrectly focused on the plat descriptors referenced in the 1969, 2005, and 2007 deeds. In addition to allowing itself to validate error, the district court's reliance upon and attribution of intent based upon the plat descriptors is contrary to Virginia law.

The Supreme Court of Virginia has addressed the issue of what import—if any—can be attached to plat maps and plat map contents and has resoundingly rejected the notion promoted by the district court's opinion. The issue was squarely addressed in *Burdette v. Brush Mountain Estates*, 278 Va. 286, 682 S.E.2d 549 (2009). *Burdette* involved the purported creation of an easement of

47

ingress and egress by virtue of the depiction of an easement along with its dimension on a plat map which is then incorporated and recorded along with a deed. *Id*. at 290-91, 684 S.E.2d at 551. Aside from the plat notations, there was no other source document creating the purported easement. *Id*. at 291, 684 S.E.2d at 552. The court ruled that a "[p]lat alone cannot serve as an instrument of conveyance." *Id*. at 298, 682. S.E.2d at 555. The Virginia Supreme Court added that plats which are generally referenced and incorporated may act as descriptors alone but absent some intent to either convey or create an easement, the notation of an easement on a plat map would not create an easement right in favor of a third-party. *See id*. at 298,  682 S.E. 2d at 556 (citing *Lancaster v. Smithco, Inc*., 246 S.C. 464, 144 S.E.2d 209 (1965)). It necessarily follows from *Burdette* that if an easement cannot be created by a reference to a plat map, an easement cannot be modified or otherwise altered by a mere plat map absent some other expression of intent. Application of the *Burdette* principle to this case extinguishes all factual and "intent" inferences drawn by the district court from the 1969, 2005, and 2007 plat maps. Thus, the district court was incorrect as a matter of law in considering the plat map references as evidence that the Easement was sixty feet wide.

# X.  CONCLUSION

For the foregoing reasons, Adamson asks the Court to (i) reverse the district court's grant of Columbia's summary judgment; (ii) enter a judgment in favor of Adamson, or alternatively, remand to the district court for a jury trial on trespass and punitive damages.

# XI.  REQUEST FOR ORAL ARGUMENT

Counsel respectfully requests oral argument pursuant to Local Rule 34(a) in order to further explain Adamson's position and answer any questions the Court may have.

/s/ S. Sadiq Gill
_____

S. Sadiq Gill, Esquire (VSB No. 30835)
Brittany J. Berlauk, Esquire (VSB No. 80131)
J. Buckley Warden IV, Esquire (VSB No. 79183)
DurretteCrump PLC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Telephone:    (804) 775-6900
Facsimile:    (804) 775-6911
sgill@durrettecrump.com
bwarden@durrettecrump.com
bberlauk@durrettecrump.com

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** _____      **Caption:** _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ ]     this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]     this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ ]     this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

   [ ]     this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

## XII.  CERTIFICATE OF SERVICE

I certify that on February 18, 2014, a copy of the foregoing Opening Brief of Appellant was served upon counsel of record, Michael S. Dingman, Travis A. Sabalewski, and Alison R.W. Toepp through the CM/ECF system.

Dated:   February 18, 2014                    /s/ S. Sadiq Gill

S. Sadiq Gill, Esquire (VSB No. 30835)
Brittany J. Berlauk, Esquire (VSB No. 80131)
J. Buckley Warden IV, Esquire (VSB No. 79183)
DurretteCrump PLC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Telephone:    (804) 775-6900
Facsimile:    (804) 775-6911
sgill@durrettecrump.com
bwarden@durrettecrump.com
bberlauk@durrettecrump.com